IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TONY L. LYONS, | ) | CASE NO. 1:17CV601 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tony Lyons ("Lyons") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

### I. Procedural History

On November 2, 2010, Lyons filed an application for SSI, alleging a disability onset date of September 17, 1989. Tr. 363. He alleged disability based on the following: left leg amputation and asthma. Tr. 393. A hearing was held before Administrative Law Judge ("ALJ") Patrick Rhoa on January 18, 2012 (Doc. 16), and ALJ Rhoa issued an unfavorable decision on March 15, 2012. Tr. 170-181. Lyons appealed, and the Appeals Council vacated and remanded ALJ Rhoa's decision on July 1, 2013. Tr. 186-188.

1

On remand, Lyons' case was assigned to ALJ Cheryl Rini, who held three hearings: on June 3, 2014 (Tr. 97-137), July 24, 2014 (Tr. 75-95), and December 2, 2014 (Tr. 34-74).  Prior to the hearing dates, Lyons amended his alleged onset date to November 2, 2010, his application date.  Tr. 450, 102.  In her April 27, 2015, decision (Tr. 11-26), the ALJ determined that there are jobs that exist in the national economy that Lyons can perform, i.e., he is not disabled.  Tr. 25.  Lyons requested review of the ALJ's decision by the Appeals Council (Tr. 5-6) and, on February 3, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Lyons was born in 1974 and was 36 years old on his alleged onset date.  Tr. 272.  He has a limited education.[1]  He has never worked.  Tr. 393.

### B. Relevant Medical Evidence[2]

**Physical:** In September 1988, Lyons injured himself while jumping out of a stolen car that was fleeing from the police and he had to have his left foot amputated below the knee ("left BKA").  Tr. 457-459.  He was treated at MetroHealth Hospital.  He also had a left proximate tibia open fracture and a pelvic fracture and a rod was placed in his left femur.  Tr. 471.  A head CT scan was negative.  Tr. 458.  In January 1989 he had been using a left leg prosthesis for two months, Tr. 490, which he continued to use thereafter, Tr. 493.

In December 2006, Lyons was released from prison with the diagnoses of asthma, GERD, and left BKA with a prosthetic device.  Tr. 496-497.

---

[1]  Lyons stated that he completed eleventh grade in his disability application, Tr. 396; tenth grade during a consultative exam, Tr. 657; and eighth grade during his hearing, Tr. 42.

[2]  The undersigned sets forth the medical evidence the parties cited in their briefs that is relevant to their arguments.

In February 2007, Lyons attended an interview at the state agency's social security office and the interviewer observed that Lyons walked with a cane and had a limp.  Tr. 389-390.

On April 6, 2007, Lyons saw Eulogio Sioson, M.D., for a consultative examination.  Tr. 531-532.  At the time, Lyons was 33 years old and was wearing a left leg prosthesis.  Tr. 531. He stated that the prosthesis he was wearing was his second one and he had had it for more than two years.  Tr. 531.  He believed that it was too short and was causing problems with his right leg.  Tr. 531.  He complained of periodic skin breakdown and sores in his stump and pain when he walked around the house, went up or down a few steps, and stood for a few minutes.  Tr. 531. He had taken a bus to the appointment.  Tr. 531.  He had been using a prescribed straight cane "for a long time" and he brought it with him to the exam.  Tr. 531.  He complained of pain rated 10/10 and stated that he does not take any pain medication.  Tr. 531.  Upon exam, he walked with a moderate limp with his leg prosthesis and no assistive device and was able to get up and down from the exam table by himself.  Tr. 531.  Dr. Sioson observed that Lyons' prosthesis appeared to be about 1.25 inches "shorter."  Tr. 531.  Lyons had no neck or back tenderness, no heat or tenderness in his joints, no open sores or skin irritation of his stump, and tenderness in the medial aspect of his left knee.  Tr. 532.  He had obvious muscle atrophy in his left leg.  Tr. 532. Manual muscle testing on his left leg from the hip down was affected by pain.  Tr. 532, 526.  Dr. Sioson opined that Lyons' ability to do work-related activities such as walking, climbing, standing, carrying, lifting, and traveling would be "significantly" limited.  Tr. 532.  He had no limitations sitting or using his upper body.  Tr. 532.

On April 14, 2007, state agency reviewing physician Jerry McCloud, M.D., opined that Lyons can perform light work with postural and environmental restrictions and that his statements are generally credible and consistent.  Tr. 535-541.

On February 23, 2010, Lyons visited the emergency room at South Pointe Hospital complaining of chest pain and shortness of breath.  Tr. 574.  He had a prosthetic leg and there was no documentation of a cane or walker.  Tr. 574.  He was diagnosed and treated for a perforated gastric ulcer; he had secondary diagnoses of asthma and status post left traumatic below-knee amputation.  Tr. 626.

On September 20, 2010, records from the City of Cleveland's House of Corrections showed that Lyons had a prosthesis and there was no documentation of a cane or walker.  Tr. 545.

On November 2, 2010, Lyons attended another interview at the state agency's office.  Tr. 401-403.  The interviewer noted that he walked with a cane and that he had difficulty standing and walking.  Tr. 403.

On November 10, 2010, Lyons visited the emergency room at South Pointe Hospital complaining of left leg pain, pressure from his prosthesis, nausea and vomiting.  Tr. 554.  He was discharged with instructions for abdominal pain and chronic alcoholism.  Tr. 558.  The records do not document that Lyons used a cane or a walker.

On March 9, 2011, Lyons saw consultative examiner Dr. Sioson again for a second evaluation.  Tr. 609-610.  Lyons reported that he had the same prosthesis since his 1988 accident and that he had also been using a walker since 1988.  Tr. 609.  He stated that he "could not do stairs" and that he had pain in his stump after walking for ten minutes and standing for five.  Tr. 609.  Upon exam, Lyons declined to walk without his walker, stating that he experienced more stump pain without it.  Tr. 609.  He could get on and off the exam table.  Tr. 609.  He had no heat, swelling, or skin abnormalities in his stump but he had some tenderness.  Tr. 610.  Examination of his joints was normal.  Tr. 609.  He had muscle atrophy in his left leg and

manual muscle testing was affected by pain, although he had good left hip and knee flexion and extension, an improvement from his prior visit. Tr. 611, 613, 526, 529. Dr. Sioson assessed left BK amputation and mild intermittent asthma and opined that Lyons was capable of performing sedentary work. Tr. 610.

On March 16, 2011, state agency reviewing physician Rannie Amiri, M.D., reviewed Lyons' records, including Dr. Sioson's recent evaluation. Tr. 143-146. Regarding Lyons' physical residual functional capacity ("RFC"), Dr. Amiri opined that he could stand and/or walk for four hours per workday and sit for more than six; could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; could never crawl or climb ladders, ropes, or scaffolds; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and must avoid all exposure to hazards. Tr. 144-146. Dr. Amiri explained that limited weight was given to Dr. Sioson's 2011 opinion that Lyons could perform only sedentary work because there was no medical evidence showing that he needed a cane or a walker and he had had normal physical exam findings of his stump. Tr. 144, 146.

On June 28, 2011, state agency reviewing physician Nick Albert, M.D., reviewed Lyons' file and adopted Dr. Amiri's opinion. Tr. 159-161. Dr. Albert added environmental restrictions, limiting Lyons to no concentrated exposure to extreme cold, wetness, and humidity. Tr. 159-161.

On August 30, 2012, Lyons visited South Pointe Hospital complaining of chest pain. Tr. 947. Upon exam, his extremities were normal and he was wearing a prosthesis. Tr. 949. He had full muscle strength in his upper and lower extremities, bilaterally. Tr. 952.

On March 18, 2013, Lyons visited South Pointe Hospital complaining of abdominal pain. Tr. 964.  Upon exam, his extremities were normal and he was wearing a prosthesis.  Tr. 966.  He had full muscle strength in his upper and lower extremities, bilaterally.  Tr. 966.

On June 2, 2013, Lyons visited South Pointe Hospital complaining of epigastric pain, nausea and vomiting.  Tr. 989.  He denied problems with his gait.  Tr. 990.  He had not followed up with his doctor after a prior hospital visit in May with the same symptoms as he had been instructed to do.  Tr. 995.  Upon exam, his extremities were normal and he was wearing a prosthesis.  Tr. 997.

On July 30, 2013, Lyons saw Dorothy A. Bradford, M.D., for a consultative examination. Tr. 664-678.  Lyons did not wear a prosthesis.  Tr. 675.  He reported that it "wore out."  Tr. 675. He stated that he mostly uses a wheelchair and can stand with a walker for one minute.  Tr. 675. He also reported having a head injury and having been in a coma after his 1988 accident.  Tr. 675.  He complained of weakness and numbness in his left hand.  Tr. 675.  Upon exam, he was non-weight bearing and used a wheelchair.  Tr. 677.  His left thigh and calf muscles were atrophied and he had decreased sensation, weakness and atrophy present in his left hand.  Tr. 677, 665.  He was unable to perform range of motion testing of his dorsolumbar spine and his range of motion was restricted in his left hip and knee.  Tr. 667-668.  Dr. Bradford summarized that Lyons had no left foot or prosthesis and was unable to walk.  Tr. 678.  She opined that his left upper and lower extremity weakness may be the result of a traumatic brain injury and that he is unable to perform even sedentary work.  Tr. 678.

On September 5, 2013, Lyons visited South Pointe Hospital complaining of abdominal pain, nausea and vomiting.  Tr. 905.  He was wearing a prosthesis.  Tr. 909.  He was also

wearing his prosthesis eight days later when he saw a podiatrist for right foot pain (Tr. 928), and a month later in October 2013 (Tr. 932).

**Mental:** On July 22, 2011, Lyons saw Michael W. Firmin, Ph.D., for a consultative examination.  Tr. 656.  Lyons reported having finished tenth grade, he had not been in special education classes and had not had an IEP.  Tr. 657.  Dr. Firmin concluded, "[Lyons'] clinical presentation, combined with performance on the sensorium and cognitive functioning tasks, suggest significantly below-average intellectual ability."  Tr. 659.  There was "insufficient evidence" to conclude Lyons had mental retardation, but "the totality of available data leads to an assignment of a Borderline Intellectual Functioning diagnosis."  Tr. 659.  Dr. Firmin also observed that Lyons was hesitant to provide information, did not put forth reasonable effort in answering questions, and seemed to be malingering and exaggerating his symptoms.  Tr. 659-660.

On August 2, 2011, state agency psychologist Karen Terry, Ph.D., reviewed Lyons' file.  Tr. 163.  Regarding his mental RFC, Dr. Terry opined that Lyons appeared to function in the borderline range of intelligence and he had moderate limitations or no significant limitations in his ability to perform a range of work activities.  Tr. 161-163.

### C.  Testimonial Evidence

#### 1.  Lyons' Testimony

Lyons was represented by counsel and testified at the first and third administrative hearings.[3]  Tr. 36-37, 97-99.

First hearing, June 3, 2014: Lyons appeared at the hearing using a walker.  Tr. 104.  He testified that he has had the walker since his accident in 1989 or 1990, when he was a teenager.  Tr. 104.  He has gotten taller since that time but no one has adjusted the height of his walker.  Tr.

---

[3]  As discussed in more detail below, Lyons forgot his ID at the second hearing and did not testify.

107.  He has had only one prosthesis, which he got when his foot was amputated.  Tr. 104.  He never got a new prosthesis made, even though he has gotten taller, because he does not have any income.  Tr. 105.  He has not been back to see the doctor who originally prescribed it, he has not asked anyone about getting another one, and he has not told anyone that he needs a new one.  Tr. 104.  He just assumed that, because he did not have money, he could not get one.  Tr. 104.  He could no longer wear his prosthesis and he last wore it around the year 2009.  Tr. 106.  He also stopped using his cane around that time.  Tr. 107.  He stated that he has a primary care physician at South Pointe Hospital, Dr. Heights.  Tr. 107-108.  He has been seeing him on and off for a couple of years.  Tr. 108.  He does not have a medical card and last had one in 2006.  Tr. 119.

When asked when he last drank an alcoholic beverage, Lyons answered that it had been "in a while," which meant "a few years" prior.  Tr. 109-110.  When the ALJ stated, "that can't be right," Lyons amended his answer to a "couple months" prior.  Tr. 110.  The last time he used marijuana was "a little off and on" a "couple months ago."  Tr. 110.  He is taking Protonix for his stomach and oxycodone for his leg pain.  Tr. 110.  He takes oxycodone twice a day on a regular basis.  Tr. 110-111.  He does not know which doctor gave him this prescription but he believes he got it in 2010.  Tr. 111.  He got it because he had swelling in his left leg.  Tr. 111.  He also uses a heating pad "just about all the time."  Tr. 113.  When the ALJ asked Lyons' attorney to locate the record that shows an oxycodone prescription from leg pain in 2010, the attorney did not have the disc with Lyons' records but stated that he would provide the record the next day.  Tr. 113.

The ALJ asked Lyons to confirm that he had an 11th grade education and Lyons confirmed that he did.  Tr. 115.  He then admitted that he did not complete 11th grade or 10th grade and that he had completed 9th grade.  Tr. 115.  He was not in special education classes.

Tr. 115. The ALJ remarked that, although Lyons' records showed that he received Fs in school, his records also showed that in 1989-1990 he was absent 83 days and late 41 days and in 1990-1991 he was absent 79 days and late 13 days. Tr. 117. He had never tried to get a GED; when asked why not, he responded, "I just didn't." Tr. 115. He was last incarcerated in 2010. Tr. 116. He never received vocational training and no one ever contacted him about getting vocational training. Tr. 116.

When Lyons' attorney asked him if he had blacked out when he was involved in the motor vehicle accident in 1989, Lyons stated that he did but did not know for how long Tr. 118. He can't remember if he hit his head. Tr. 118. When he was in jail he did not have problems related to a possible head injury that he may have had. Tr. 120. When he goes to emergency rooms, he mentions to staff that he had a brain injury. Tr. 121.

A couple of months ago, Lyons started having problems with his left hand. Tr. 123. His attorney reminded him that he mentioned a problem with his left hand to the consultative examiner in 2013. Tr. 123-124. He is left hand dominant. Tr. 124. Lyons believes the problem stems from a pinched nerve. Tr. 124. X-rays were taken a couple of months before the hearing. Tr. 124. An appointment was scheduled in two weeks for a follow-up and Lyons' attorney assured that he would obtain the records from that visit. Tr. 136.

Medical expert ("ME") Dr. Alan Kravitz began to testify at the hearing but it quickly became apparent that he did not have all of Lyons' medical records. Tr. 125-126. After discussion with Lyons' counsel, the ALJ scheduled a supplemental hearing with Dr. Kravitz after Dr. Kravitz reviewed all Lyons' medical records. Tr. 126-130. The ALJ also discussed with Lyons' counsel the fact that there was a gap in the records from March 2011 until August 2012

and Lyons' attorney agreed to look into whether there are any outstanding records from that time period.  Tr. 130-131.

Second hearing, July 24, 2014: Lyons was not present at the second hearing because he forgot to bring his ID and he was not permitted into the building.  Tr. 77.  Lyons' attorney wanted to proceed with the hearing without Lyons and stated that Lyons had given him permission to do so.  Tr. 77.  The ALJ remarked that the attorney had submitted a number of new records that raised a lot of issues that were not discussed at the first hearing.  Tr. 77-78.  The ALJ began the hearing, commenting that both experts (Vocational Expert Tracy Young and ME Kravitz) were ready to testify.  Tr. 78.

The ALJ summarized the history of Lyons' case, including the procedural history and his records.  Tr. 79-81.  The ALJ confirmed with Lyons' attorney that Lyons' did not get an EMG or nerve conduction study done on his left hand, which had been recommended, and Lyons' attorney agreed that there was no evidence of such tests or study in the record.  Tr. 82.  Lyons' attorney referenced his prior request to have Lyons undergo IQ testing and which the ALJ had previously denied.  Tr. 79.  Counsel stated that he believed that disability is warranted at Step Three, based on Listing 1.05C.  Tr. 83.  He also mentioned "the 12.00."  Tr. 83.  The ALJ asked Lyons' attorney, "What 12.00?" and the attorney responded, "well, that we thought he'd get IQ testing."  Tr. 84.  The ALJ answered, "So 12.05 is what we were saying?" and the attorney agreed.  Tr. 84.  The ALJ mentioned that Listing 12.05 requires adaptive functioning before age 22 and stated that Lyons had not supplied any evidence of that.  Tr. 84.  The attorney mentioned Lyons' grades in school and then asserted, "psychological testing may affect a Step 5 determination" with respect to the number of jobs in the national economy that Lyons could perform.  Tr. 84.

Lyons' attorney wished to proceed with the hearing without Lyons; the ALJ deemed it unwise to do so; Lyons' attorney objected; the ALJ noted the attorney's objection; and she overruled his objection and scheduled a supplemental hearing. Tr. 85-91. Lyons' attorney then objected to the experts appearing by telephone and stated that they should have to appear in person. Tr. 91. The ALJ asked the attorney why he did not object to the experts appearing telephonically the last two hearings and the attorney objected to being asked. Tr. 91. The ALJ mentioned that if the experts had to appear in person it would probably mean another expert would be selected. Tr. 92. The attorney objected and stated that the same experts, (ME Kravitz and VE Young) should have to come in person. Tr. 92-93. The ALJ remarked that some experts appear only by phone. Tr. 94.

Third hearing, December 2, 2014: Lyons appeared and testified at the third hearing. Tr. 36. ME Kravitz appeared by phone and testified at the hearing. Tr. 38. The ALJ explained that she tried to find an ME who would appear in person, as Lyons' attorney had requested, but that no ME would appear in person because it is no longer part of their contract with the agency. Tr. 38.

The ALJ recited the procedural history of Lyons' case. Tr. 40-41. The ALJ stated that she found that Lyons did not meet Listing 1.05C based on Lyons' testimony at the prior hearing "regarding the availability of a replacement prosthesis." Tr. 41.

Lyons confirmed that he had never completed ninth grade but had instead started the ninth grade. Tr. 42. When asked when he last visited the hospital or emergency room Lyons stated that he had gone "this year," 2014, for asthma. Tr. 42. He was also treated at that time for leg pain, stomach pain, back pain, and his hand. Tr. 43. He has asthma attacks "off and on," "regular[ly]," about "once a month" or twice a month. Tr. 43-44. He takes Albuterol for his

11

asthma, "pretty often," "twice a day."  Tr. 44.  He also has a nebulizer machine at home that he

uses "as needed," "about every day just about," "once in a while, like every – as needed, you

know, every two weeks, something like that."  Tr. 45.  He sees a doctor at South Pointe Hospital

for his asthma but he does not remember the doctor's name.  Tr. 46.  The doctor has been

treating him every month at South Pointe Hospital for his asthma.  Tr. 46.

        Lyons came to the hearing without his prosthesis and on crutches.  Tr. 47, 62.  He got the

crutches from South Pointe Hospital a couple of months prior.  Tr. 47.  The ALJ asked Lyons

whether he had reached out to the people who originally got him his prosthesis as she had

suggested at the first hearing and Lyons stated that he made a call but that they couldn't help

him.  Tr. 48.  No one at South Pointe Hospital could help him because "I don't have nothing."

Tr. 48.  The last time he used his prosthesis was a couple of years ago.  Tr. 49.  The ALJ

remarked that she believed she had seen mention of Lyons using a prosthesis in the record more

recently than two years ago and cited a record from September 2013.  Tr. 49.  Lyons' attorney

confirmed with Lyons that he had not been using his prosthesis for "two years" and Lyons

confirmed that it had been two years.  Tr. 49.  The ALJ remarked that she had seen at least one

medical record showing that Lyons was still using his prosthesis and she gave Lyons' attorney a

few minutes to present testimony about Lyons' condition or make an opening statement.  Tr. 49.

Lyons' attorney stated that he had made his position clear and that if the ALJ wanted more

medical records he would be happy to order them "for the sake of completion of the record."  Tr.

50.  The ALJ stated, "It's up to you, counsel.  It's your case."  Tr. 50.  Lyons' attorney stated that

he would be "delighted to try" to update the record because he believed that Lyons had been seen

in September 2014 and the records only go up to August 2014.  Tr. 50.  The ALJ stated, for the

second time, that Lyons' records were current only up to May 2014.  Tr. 42, 50.  Lyons' attorney

said that he would get updated records and provide them to the ALJ.  Tr. 50.  The ALJ

mentioned that doing so would pose a problem because the ME was going to testify and the ME

would need the updated records.  Tr. 50.  Lyons' attorney suggested that they "proceed with

interrogatories at that point" and the ALJ stated that she would not use interrogatories.  Tr. 50-

51.  Lyons' attorney said he would order the updated records and if they came in before the ALJ

makes her decision "and you want to look at them, you can.  And whatever way you want to

handle it, it's fine."  Tr. 51.  After further back and forth, the ALJ reiterated to Lyons' attorney

that he was responsible for developing the claimant's file and that the last submission the agency

had was from May 28, 2014.  Tr. 52.  Lyons' attorney stated that any new records "may or may

not make a difference" and that they should move on with the hearing and the ME testimony.  Tr.

52.

   After more discussion, the ALJ asked Lyons' attorney what other listings he was alleging

that Lyons met.  Tr. 52-54.  Lyons' attorney eventually stated, "We have an IQ issue" and

referred to "documentation in the record that he suffered a severe brain injury."  Tr. 54.  The ALJ

asked, "Where?  Where is brain injury?" and explained,

   ALJ: I'm asking you because I need to be able to find it in the record.  If you are to make
   some kind of statement about this, please—

   Atty: Instead of being a fact finder, it appears to me that you're being more of an
   interrogator and trying to argue with me.

   ALJ: Oh, no.  Counsel—

   Atty: I'm not here to argue with you.

   ALJ: Come on, Counsel, You are arguing with me.  Come on.

   Atty: You Honor, if you look at the—

   ALJ: I'm trying my best, Counsel, to be as understanding as I can when you've got a
   difficult—

Atty: We waive the right to make any further opening statement at this time.  How's that sound?  Let's move on with the hearing.

Tr. 54.  Lyons' attorney agreed that if the ME did not touch on any of the impairments that Lyons' attorney believed were at issue, the attorney would "ask him about it."  Tr. 55.

### 2. Medical Expert Testimony

ME Kravitz testified next.  Tr. 55.  Despite the fact that Lyons' attorney had requested Dr. Kravitz specifically, counsel objected to Dr. Kravitz's qualifications and the ALJ permitted him to voir dire Dr. Kravitz.  Tr. 56.  In sum, it was established that Dr. Kravitz was not board certified in orthopedic medicine and that his primary specialty is internal medicine and his secondary specialty cardiovascular.  Tr. 56.  He has not treated patients for two years; he has, since that time, been an internist consultant.  Tr. 57.  All this information was in his CV, which he pointed out to Lyons' attorney.  Tr. 59.  Lyons' attorney had no further questions but renewed his objections to Dr. Kravitz's testimony on the basis of "his qualifications to testify in this particular case."  Tr. 59.

Dr. Kravitz specified Lyons' impairments: mild asthmatic bronchitis, traumatic amputation of the left foot, substance abuse, alcoholic hepatitis, and GI bleeding.  Tr. 60.  He also has some psychological problems that Dr. Kravitz stated he was not qualified to testify about.  Tr. 60.  Dr. Kravitz said, "It's not clear to me whether he's using the prosthesis or not.  Some records indicate that he does, and others [] indicate that he doesn't."  Tr. 60.  Considering all of Lyons' impairments, Dr. Kravitz opined that Lyons would equal Listing 1.05C; "I'm assuming that he does not have a prosthesis or he can't get a prosthesis and that he will not or cannot stop using substances."  Tr. 61.  Lyons' attorney asked Dr. Kravitz if he had an onset date for equivalence and Dr. Kravitz responded that it is before 2011 and reiterated, "I'm assuming

14

that he's not using his prosthesis and that he won't or can't stop using drugs."  Tr. 61.  Dr. Kravitz then gave an RFC assessment that assumed Lyons does not have a prosthesis: he cannot stand or walk very far; he could sit; and, assuming he is still using substances, "I'm not sure he can do anything .... So I guess he'd be a very severe restriction of sedentary, your honor."  Tr. 62.

Lyons' attorney asked Dr. Kravitz for his assessment of Lyons' ability to stand and walk in an 8-hour day if Dr. Kravitz set aside Lyons' substance abuse issues.  Tr. 63.  Dr. Kravitz opined that Lyons could stand and walk for 10 minutes at a time followed by a break and for no more than 2 hours in an 8-hour day.  Tr. 63.  He would also assess an environmental hazards restriction.  Tr. 63.

### 3. Vocational Expert's Testimony

Vocational Expert Deborah Lee ("VE") was personally present, per Lyons' attorney's request, and testified at the third hearing.  Tr. 38.  The ALJ confirmed with the VE that Lyons had no past relevant work.  Tr. 65.  The ALJ asked the VE to determine whether a hypothetical individual of  Lyons' age, education and work experience could perform work if that person had the following characteristics: can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand about 4 hours in an 8-hour workday and has an unlimited ability to sit; can never use foot controls with the left lower extremity; can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can occasionally balance, stoop and crouch but can never kneel or crawl; has no manipulative limitations; must avoid concentrated exposure to fumes, odors, dusts or gases, extreme cold, wetness and humidity; must avoid hazards such as unprotected heights and moving machinery and cannot operate a motor vehicle or work on vibrating surfaces; can perform jobs that involve short demonstration or up to a month of training without strict

production or rapid production quotas; can engage in superficial interaction with others, i.e., work that does not involve arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others; can have frequent contact with the general public, coworkers and supervisors and would perform best in a predictable setting. Tr. 65-66. The VE answered that such an individual could perform light work as a cashier, limited to positions that are performed in a seated position (2,800 regional jobs; 8,400 Ohio jobs; 200,700 national jobs), final assembler, a sedentary job (300 regional jobs; 900 Ohio jobs; 21,900 national jobs) and "touchup screener printed circuit board assembler," a sedentary job (50 regional jobs; 175 Ohio jobs; 3,400 national jobs). Tr. 66-67. The ALJ asked the VE if her answer would change if the individual can understand, remember and carry out routine and repetitive instructions as well as more detailed instructions but no highly detailed or complex instructions; can sustain attention and concentration, persistence and pace to perform routine tasks; and would perform best in a setting where strict production demands are not enforced. Tr. 69. The VE replied that her answer would not change. Tr. 70.

Next, Lyons' attorney asked the VE to consider whether the ALJ's second hypothetical individual could perform the jobs mentioned if the individual can stand and walk for 2 hours a day for no more than 10 minutes at a time. Tr. 71. The VE answered that such an individual could still perform the jobs previously identified. Tr. 71. Lyons' attorney asked the VE if her answer would change if the individual could only lift up to 10 pounds and is medically required to have crutches for walking and standing. Tr. 71-72. The VE answered that, while such an individual could perform the work with crutches, there may be a restriction barring the presence of crutches in a production setting—"just basically getting into a factory type setting"—

effectively eliminating those jobs.  Tr. 72.  It would not make a difference if the device was a pair of crutches, a walker or a cane.  Tr. 72-73.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her April 27, 2015, decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since November 2, 2010, the application date.  Tr. 14.

2.      The claimant has the following severe impairments: left below knee amputation, asthmatic bronchitis, polysubstance abuse causing gastrointestinal bleeding and alcoholic hepatitis, depressive disorder, anxiety disorder, and borderline intellectual functioning.  Tr. 14.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

4.      The claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b).  Specifically, he can lift and/or carry 20 pounds occasionally, 10 pounds frequently. He can stand for about 4 hours in [an] 8-hour day.  He is unlimited in his ability to sit.  He can never use foot controls with the left lower extremity.  He can never climb any ladders, ropes or scaffolds; never crawl or kneel.  He can perform all other postural maneuvers on an occasional basis meaning climbing of ramps or stairs, balancing, stooping and crouching.  He has no manipulative, visual or communicative limitations.  He should avoid concentrated exposure to fumes, odors,

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

dusts or gases.  He should avoid work at unprotected heights, around dangerous moving machinery, and operating a motor vehicle.  He should avoid concentrated exposure to extreme cold, wetness and humidity.  He should avoid work on vibrating surfaces. He can perform jobs that involve short demonstration or up to a month of training without strict production or rapid production quotas.  He can engage in superficial interaction with others such as work that does not involve any arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others.  He is able to perform work that involves frequent contact with the general public, coworkers and supervisors.  He would perform best in a predictable setting.  Tr. 16-17.

5.      The claimant has no past relevant work.  Tr. 24.

6.      The claimant was born on January 1, 1974 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 24.

7.      The claimant has a limited education and is able to communicate in English.  Tr. 25.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 25.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 25.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 2, 2010, the date the application was filed. Tr. 26.

## V. Plaintiff's Arguments

Lyons objects to the ALJ's decision on four grounds: the ALJ deprived him of a full and fair hearing; the ALJ erred at Step Three; the ALJ's RFC determination was erroneous and not supported by substantial evidence; and the Commissioner did not meet her burden of proof at Step Five.  Doc. 17, p. 6.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not deprive Lyons of a full and fair hearing

Lyons argues that the ALJ deprived him of a full and fair hearing because: (1) she "delayed issuing a decision after the Appeals Council remanded the case"; (2) she continued the July 24, 2014 hearing; (3) she "refused to permit interrogatories to Dr. Sison [sic]"; (4) "she refused to order a consultative examination for IQ testing and evaluation of Lyons' traumatic brain injury so that it can be evaluated at Step 3 and/or 5"; and (5) she provided an "unalterable opinion that Plaintiff's amputation did not meet Listing 1.05C (now 1.05B)." Doc. 17, p. 15.

An ALJ has a duty to provide a claimant with a full and fair hearing. *Lashley v. Sec. of Health & Human Servs*., 708 F.2d 1048, 1051 (6th Cir. 1983). "Under special circumstances—when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures—an ALJ has a special, heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. App'x 456, 459 (6th Cir. 2008) (citing

*Lashley*, 708 F.2d at 1051–1052).  There is no bright line test; instead, a court decides the issue on a case by case basis.  *Lashley*, 708 F.2d at 1052.

Here, Lyons had counsel throughout the pendency of this case.  Therefore, the ALJ did not have a special, heightened duty to develop the record.  *See Wilson*, 280 Fed. App'x at 459.

### 1. Delayed decision

Lyons' first argument, that the ALJ "delayed issuing a decision after the Appeals Council remanded the case" (Doc. 17, p. 15), lacks merit.  He admits that the Social Security regulations do not specify a time limit for decision-making after remand but argues that "this delay should be taken into consideration by this Court in determining whether Plaintiff was provided a full and fair hearing."  Doc. 17, p. 15.  The undersigned disagrees; while regrettable, a delay in issuing a decision does not equate to the ALJ depriving a claimant of a full and fair hearing.

The undersigned also notes that, on remand, the case had to be assigned to a new ALJ because the prior ALJ had passed away.  Doc. 17, p. 3.  The first hearing was continued because the medical expert did not have all the records and the second hearing was continued because Lyons forgot his ID and was not permitted to enter the building to testify.  The ALJ's decision was issued four months after the third and final hearing, which is not an unreasonable length of time.  Moreover, throughout this time period, Lyons' attorney had twice stated that he needed to obtain updated medical records to provide to the ALJ (Tr. 130-131 (first hearing); Tr. 50 (third hearing)) and, at the second hearing, he requested that the ME and VE appear in person at the third hearing (Tr. 91), which may have caused further delay in scheduling.  None of these delays is attributable to the ALJ.

### 2. Continuing the hearing

The fact that the ALJ continued the second hearing because Lyons forgot his ID and could not gain access to the building to testify does not suggest that the ALJ deprived Lyons of a full and fair hearing.  Instead, it suggests the opposite—the ALJ was determined to give Lyons a full and fair hearing.

### 3. Interrogatories to consultative examiner

Lyons does not supply legal authority for his assertion that an ALJ is required to permit a claimant to propound interrogatories to a consultative examiner based on reports the consultative examiner made seven and three years prior to the hearing.  The only case he cites refers to "post hearing reports" (Doc. 17, p. 16, citing *Flatford v. Chater*, 93 F.3d 1296, 1307 (6th Cir. 1996) (cross-examination of post-hearing report))."  Dr. Sioson's reports were not post-hearing reports.  The ALJ's failure to permit Lyons' counsel to propound interrogatories to Dr. Sioson did not deprive him of a full and fair hearing.

### 4. IQ testing

The fact that the ALJ "refused" to order a consultative examination for IQ testing and evaluation of Lyons' "traumatic brain injury so that it can be evaluated at Step 3 and/or 5" (Doc. 17, pp. 16-18) did not deprive Lyons of a full and fair hearing because an ALJ is not required to order a consultative examination.  "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing *Landsaw v. Sec'y of Health & Human Servs*., 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.")).

Moreover, there is no evidence in the record that Lyons suffered a traumatic brain injury, as the ALJ observed.  Tr. 20.  When the ALJ asked Lyons' attorney to locate a medical record showing a traumatic brain injury, Lyons' attorney could not locate such a record.  Tr. 54.  The fact that Lyons told a consultative examiner that he had suffered a head injury in 1988 and had been in a coma (Tr. 675) is not a medical record showing that he had a traumatic brain injury.  It was reasonable for the ALJ to decline to order an evaluation of Lyons' purported brain injury when there was no evidence that he had a brain injury.

Lyons' new argument that was not presented to the ALJ at the hearing as a reason she should order IQ testing is that the IQ test was necessary "to determine whether it dropped 15 points from the 86 GAMA test" and to tie such testing to Listing 12.02, neurocognitive disorders. Doc. 17, p. 17.  This new argument fails.  At the second hearing, the ALJ specifically asked Lyons' attorney what listing he claimed to have met or equaled.  Tr. 83.  Lyons' attorney answered, "the 12.00."  The ALJ asked, "What 12.00?"  Lyons' attorney replied, "Well, that we thought he'd get IQ testing."  Tr. 83-84.  The ALJ said, "So 12.05 is what we were saying?" and Lyons' attorney stated, "Exactly."  Doc. 84.  Now Lyons claims that his request for IQ testing "was not made" pursuant to Listing 12.05.  Doc. 17, p. 17.  Having expressly told the ALJ he was seeking consideration of Listing 12.05, borderline intellectual functioning, Lyons cannot claim that the ALJ deprived him a full and fair hearing for not permitting IQ testing for a Listing he did not identify at the hearing.

### 5. Opinion regarding Lyons' amputation

Lyons argues that the ALJ provided an "unalterable opinion" at the hearing that Lyons' amputation did not meet Listing 1.05C[5] (Amputation due to any cause) and this indicates that the

---

[5]  At the time of the hearing, the relevant listing was Listing 1.05C.  Currently, it is Listing 1.05B.  To avoid confusion, the undersigned will refer to Listing 1.05C, the listing discussed by the ALJ and referred to by the parties.

ALJ had a "closed mind."  Doc. 17, p. 18.  The undersigned disagrees.  Listing 1.05C (now

1.05B) provides,

> One or both lower extremities at or above the tarsal region, with stump complications
> resulting in medical inability to use a prosthetic device to ambulate effectively, as defined
> in 1.00B2b, which have lasted or are expected to last for at least 12 months.

As described in more detail in the section below, the ALJ stated that Lyons did not meet Listing

1.05C based on Lyons' prior testimony that he had never inquired as to whether he could get a

new prosthesis; Lyons had not testified that he was medically unable to use a prosthesis.  Tr. 40-

41.

In sum, the ALJ did not deprive Lyons of a full and fair hearing.

**B. The ALJ did not err at Step Three**

**1. Whether Lyons is medically unable to wear a prosthesis**

Lyons argues that the ALJ's Step Three decision was contrary to law and not supported

by substantial evidence.  Doc. 17, pp. 18-19.  He argues that the ALJ's finding that he did not

meet or equal Listing 1.05C was contrary to law because Lyons had testified that he could not

afford to buy a prosthesis "and that his prosthesis cannot be used effectively."  Doc. 17, p. 19.

To meet Listing 1.05C a claimant must have "stump complications resulting in medical inability

to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted or

are expected to last for at least 12 months."  Although Lyons frames this issue as one "contrary

to law," he is challenging the ALJ's factual determination that Lyons did not have stump

complications that rendered him medically unable to wear a prosthesis.

Lyons' argument fails because the ALJ found that Lyons is able to wear a prosthesis

based on the fact that he had been wearing it, albeit not when he interacted with social security

staff and consultative examiners for the purpose of obtaining social security benefits.  Tr. 14-15,

21.  The record supports the ALJ's finding; numerous records dated before and after Lyons' consultative examinations reveal that he regularly wore his prosthesis.  See, e.g., Tr. 966, 997 (hospital visits in March and June 2013 wherein Lyons was wearing a prosthesis); Tr. 675 (July 2013 visit with consultative examiner Dr. Bradford wherein Lyons was not wearing a prosthesis and told Dr. Bradford that it "wore out"); Tr. 909, 932 (three visits (two hospital, one doctor's office) in September and October 2013 wherein Lyons was wearing a prosthesis).  Furthermore, the ALJ did not find Lyons' June 2014 hearing testimony regarding his inability to afford a prosthesis credible because Lyons had also testified that he had not told any of his doctors he had problems with his prosthesis or discussed getting a new one.  Tr. 21.  He had also testified that he had not worn his prosthesis since 2009 or 2012, statements that are flatly contradicted by the record.  Tr. 21.

Lyons' argument that "there is no evidence in the record that Plaintiff could realistically obtain [a prosthesis]" (Doc. 17, p. 19) fails because he incorrectly places the burden at Step Three on the ALJ and identifies the absence of evidence to support his argument.  It is Lyons' burden to present specific medical evidence that he is medically unable to wear a prosthesis due to stump complications in order to meet or equal Listing 1.05C, and he has not done so.  *See Walters*, 127 F.3d at 529 (the claimant has the burden at Step Three to show that his impairment meets or medically equals a listing); *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004) ("When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").

Finally, Lyons argues that the ALJ's decision is not supported by substantial evidence because the ME reviewed all the evidence and found that Lyons "met the listing." Doc. 17, p. 19.[6] This is an incorrect statement. The ME, Dr. Kravitz, found that Lyons medically equaled Listing 1.05C, not that he met Listing 1.05C. Tr. 60-61. Moreover, when Dr. Kravitz found that Lyons medically equaled Listing 1.05C, it was based on his assumption that Lyons did not wear a prosthesis. Tr. 61 ("I'm assuming that he does not have a prosthesis or he can't get a prosthesis .... But for the record, I'm assuming that he's not using his prosthesis ..."). As explained above, the ALJ did not credit Lyons' statements that he did not wear a prosthesis. Lyons does not challenge the ALJ's credibility assessment and the ALJ's credibility assessment is thoroughly explained in her decision and supported by the record. Tr. 21, 22, 23.

### C. The ALJ's RFC determination is supported by substantial evidence

Lyons argues that the ALJ "never cited or weighed" the factors in 20 C.F.R. § 416.927(c)(1)-(5) when she assigned weight to the opinions of Drs. Sioson, Bradford, Firmin, and the state agency reviewing physicians. Doc. 17, p. 20. Section 416.927(c) provides that the ALJ will consider all of the following factors when deciding the weight to give to a medical opinion: the length of treatment; the frequency of examination; the nature and extent of the treatment relationship; supportability, i.e., the amount of relevant evidence supporting the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors which tend to support or contradict the opinion. The regulation does not provide that the ALJ must cite all the factors in her decision. *See Biestek v. Comm'r of Soc. Sec.*, --F.3d--, 2017 WL 6605603, at *3 (6th Cir. Dec. 27, 2017) ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor" in § 416.927, citing *Francis v. Comm'r of Soc.*

---

[6] The undersigned observes that, at the hearing, Lyons's attorney objected to Dr. Kravitz's qualifications and his ability to testify in this case. Tr. 59.

*Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–07 (6th Cir. 2009).  Thus, Lyons' argument that the ALJ erred because she failed to cite the factors fails.  He does not explain why he believes that the ALJ purportedly did not consider these factors and any purported argument with respect to that issue is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted).

Lyons next argues that the ALJ erred when she found that Lyons "did not need a medically assisted device" such as a cane, walker, or wheelchair.  Doc. 17, p. 20.  Lyons got his prosthesis when he was 14 years old and the ALJ acknowledged that he had grown taller since that time.  Tr. 107.  Lyons claims, "there is no question that Plaintiff needed a medically assisted device because his prosthesis could not work due to increased increase [sic] in height between 14 and 41 (age at decision)."  Doc. 17, pp. 20-21.  First, it cannot be said that Lyons' prosthesis "could not work" due to his increased height because Lyons had been wearing his prosthesis.  Next, the ALJ explained why Lyons did not need a wheelchair.  Tr. 22 ("There is no evidence he is confined to a wheelchair.").  The ALJ also observed that medical records did not indicate that he was using a cane or walker (except when he visited the social security office and attended consultative examinations for the purpose of obtaining disability benefits).  Tr. 14.  The ALJ did not find Lyons' statements that he needed a walker and/or cane credible.  Tr. 14-15 ("I find the claimant has not been forthright regarding this matter which severely damages his credibility"); see also Tr. 21 (ALJ explaining that the record evidence undermines Lyons' credibility because it does not show he sought treatment for his alleged symptoms); Tr. 20, 23-24 (ALJ explaining

that Lyons was not credible because, in part, he routinely denied substance and alcohol abuse but also routinely tested positive for cannabinoids, elsewhere admitted substance abuse, and he had been diagnosed with alcoholic hepatitis; and because Lyons had denied to some providers that he had any prior legal or criminal history yet he had been incarcerated in 2006 and 2010).  Again, Lyons does not contest the ALJ's credibility assessment.  The ALJ did not err in her RFC assessment.  *See, e.g.*, *Blackburn v. Colvin*, 2016 WL 4821766 at *5 (N.D. Oh. Sept. 15, 2016) (ALJ did not err when finding that the claimant's use of crutches and a wheelchair to ambulate were not supported by medical documentation as required by Social Security Ruling 96-9p); *Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 3738270 (N.D. Oh. Jul. 29, 2014) ("Mitchell's testimony does not qualify as 'medical documentation establishing the need' for the cane under SSR 96–9p.").

Lyons argues that the ALJ erred by relying on state agency reviewing opinions when those physicians had not "reviewed over 300 pages of medical evidence including ongoing treatment notes from the claimant's treating source."  Doc. 17, p. 21.  This argument fails.  Lyons does not identify which of the alleged 300 pages of medical records he believes are important and does not identify who his treating physician is.  Moreover, an ALJ may rely on a state agency reviewing physician's opinion even though that reviewing physician did not review all the medical records so long as the ALJ did review the later records.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) (an ALJ does not err when she relies on state agency reviewing opinions based on an incomplete record when the ALJ considers the complete record).  Here, the ALJ reviewed all Lyons' records.

Lyons' contention that the ALJ erred because her RFC assessment "did not follow any acceptable medical source who examined" him (Doc. 17, p. 21) fails because it is within the purview of the ALJ to formulate an RFC.  *See* 20 C.F.R. § 404.1527(d).

In short, substantial evidence supports the ALJ's decision and it must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

**D. Substantial evidence supports the ALJ's finding at Step Five.**

The primary basis for Lyons' Step Five argument is that the ALJ erred in her RFC assessment and, thus, in her hypothetical question to the VE.  Doc. 17, p. 22.  This argument fails because the ALJ's RFC assessment was not erroneous.

Lyons' other argument is that the cumulative total of jobs in the national economy the VE identified, 226,000, "is not significant as a matter of law."  Doc. 17, p. 23 (citing "*Harmon v. Apfel*, 168 F.3d 289 (6th Cir. 1999) (700,000 nationally available jobs is significant)"). Although Lyons' cited legal authority found that 700,000 national jobs was a significant number, such a finding does not mean that 226,000 national jobs is not a significant number.  *C.f. Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (6,000 national jobs is a significant number).  Moreover, the three jobs identified by the VE totaled 3,150 jobs in the local economy, a significant number of jobs.  *See Harmon*, 168 F.3d at 292 (remarking that 125 local jobs has been found to be a significant number, citing *Stewart v. Sullivan*, 1990 WL 75248, at *4 (6th Cir. June 6, 1990)).

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: February 16, 2018

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).